# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Rebecca R. Pallmeyer | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 03 CR 851 - 1, 2 | **DATE** | 2/26/2004 |
| **CASE TITLE** | USA vs. Silesia Flavorings, Ortwin Winter | | |

**MOTION:**

[In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____. .

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m) ☐ Local Rule 41.1 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).

(10) ■ [Other docket entry]    Enter Memorandum Opinion And Order. Defendant Ortwin Winter's motion to suppress statements (Doc. No. 11-1) is denied. Defendants' motion for a bill of particulars (Doc. Nos. 12-1, 17-1) and joint motion for exculpatory evidence (Doc. No. 13-1) are denied. Defendants' joint motion to suppress documents obtained in violation of the Fourth Amendment and for an evidentiary hearing (Doc. Nos. 16-1, 16-2) is granted as to the request for an evidentiary hearing and otherwise entered and continued for resolution after the hearing. Defendants' joint motions for early return of subpoenas pursuant to Rule 17(c) Doc. No. 15-1) and for prior notice of the government's intention to use Rule 404(b) evidence at trial (Doc. No. 14-1) are both granted.

(11) ■ [For further detail see order attached to the original minute order.]

| | | | | |
|---|---|---|---|---|
| | No notices required, advised in open court. | | | |
| | No notices required. | **5** | | **Document Number** |
| ✓ | Notices mailed by judge's staff. | number of notices | | |
| | Notified counsel by telephone. | MAR 01 2004 | | |
| | Docketing to mail notices. | date docketed | | |
| | Mail AO 450 form. | docketing deputy initials | | |
| | Copy to judge/magistrate judge. | | | |
| ETV | courtroom deputy's initials | 2/26/2004 date mailed notice | | |
| | | Date/time received in central Clerk's Office | ETV mailing deputy initials | |

UNITED STATES OF AMERICA,      )
                        )
       Plaintiff,           )
                        )
       v.                   )      No. 03 CR 851
                        )
SILESIA FLAVORINGS, INC., ORTWIN    )      Judge Rebecca R. Pallmeyer
WINTER, and JUAN CARLOS         )
RODAS-MISA,                   )
                        )
       Defendants.       )

DOCKETED

MAR 0 1 2004

## MEMORANDUM OPINION AND ORDER

Defendants Silesia Flavorings, Inc. ("Silesia"), Ortwin Winter, and Juan Carlos Rodas-Misa have been charged with violating federal laws governing the safe transportation of hazardous materials on airplanes, and conspiring to commit such violations. Currently before the court are Defendants' pretrial motions seeking (1) suppression of certain statements made by Defendant Winter; (2) a bill of particulars; (3) production of exculpatory evidence; (4) suppression of certain documents and an evidentiary hearing; (5) early return of subpoenas pursuant to Rule 17(c); and (6) prior notice of the government's intention to use Rule 404(b) evidence at trial. For the reasons stated here, the motions are granted in part and denied in part.

### BACKGROUND

Silesia is an international manufacturer and distributor of "liquid flavoring extracts," which are chemicals used to flavor food products. From the time Silesia started doing business in Elk Grove Village, Illinois in 1997, Defendant Winter served as the company's Executive Vice-President. Defendant Rodas-Misa joined Silesia as a salesperson some time after the company moved to Hoffman Estates, Illinois in January 1999. (Indictment ¶¶ 1c, 1d, 1e.)

The indictment alleges that many of the liquid flavoring extracts produced by Silesia constitute hazardous materials pursuant to Department of Transportation ("DOT") regulations.



Specifically, the extracts are said to be "flammable liquids" which must be transported in accordance with DOT safety regulations governing the content of shipping papers and the marking, labeling, and strength of packaging containing hazardous materials. (Id. ¶¶ 1f-1j.) According to the indictment, at least since April 1998 and continuing until February 2000, Winter and Rodas-Misa conspired to transport by aircraft certain flammable liquid flavoring extracts without proper DOT-required declarations, packaging, markings, and labeling (Count One). (Id. ¶¶ 2-9.) Rodas-Misa allegedly instructed one or more Silesia employees to arrange five shipments between April 30, 1998 and February 5, 1999, and Winter directed Rodas-Misa to transport a sixth shipment himself on or about December 19, 1999. On January 22, 2000, Rodas-Misa allegedly attempted to transport a seventh shipment on a flight from Chicago, Illinois to Mexico; however, the Federal Aviation Administration ("FAA") seized the shipment before Rodas-Misa boarded the plane. According to the indictment, Winter instructed a Silesia employee to provide the FAA with a false explanation for the attempted transportation. (Id. ¶¶ 7, 10a-10k.)

In Counts Two through Fifteen of the indictment, the government charges Silesia and Rodas-Misa with substantive violations of the hazardous materials laws based on the seven liquid flavoring extract shipments. 49 U.S.C. §§ 46312, 5124. The indictment includes Winter in four of the substantive Counts relating to the shipments made on December 19, 1999 and January 22, 2000. (Indictment, Counts Seven, Eight, Fourteen, and Fifteen.)

## DISCUSSION

**1.     Winter's Motion to Suppress Statements**

  **A.     Background**

Winter claims that on January 22, 2000, he and his family were traveling to Mexico with Rodas-Misa when federal agents searched Rodas-Misa's luggage and seized a quantity of liquid flavoring that allegedly had not been properly declared and labeled as a flammable liquid. (Motion

2

¶ 1.)  Three weeks later on February 11, 2000, approximately 20 law enforcement agents arrived at Silesia's offices with a search warrant.  The agents asked for Winter, showed him the warrant, and began assembling employees in the front lobby area.  Some of the agents asked employees to provide their names, addresses, telephone numbers, and job titles, while other agents searched the premises.  (*Id.* ¶¶ 2, 3.)  According to a DOT report prepared by Special Agent Megan Murray, Winter "was advised" (Murray does not say by whom) "that any or all of his employees were free to leave" after everyone had been identified.  Winter claims that neither he nor any of Silesia's staff believed this to be the case, and as the search proceeded, employees did remain in the lobby area.  (*Id.* ¶ 4; Gov't Response, Ex. B.)[1]

Throughout the morning, agents selected employees to accompany them to other rooms inside the Silesia facility, where they were interviewed.  At lunch time, the agents ordered pizza for themselves but did not offer the employees anything to eat.  Winter, however, was allowed to retrieve a banana from his office, accompanied by an agent.  (Motion ¶¶ 4, 11.)  When the agents asked Winter to follow them to a separate office for questioning, they never read him his *Miranda* rights and, according to Winter, did not inform him that he was free to leave or that he could refuse to answer any questions.  (*Id.* ¶ 5.)  The DOT report produced by Special Agent Jacquie Wente indicates, to the contrary, that Winter was in fact specifically notified that he was not under arrest and was under no obligation to answer any questions.  (Gov't Response, Ex. A.)  The interview was conducted by three agents and lasted approximately 45 minutes.  Winter notes that he is a German citizen raised and educated in Germany and states that he did not believe that he could refuse to speak with the agents or leave the premises.  (Motion ¶ 5.)

---

[1]     The Government's Consolidated Response to Defendants' Pre-Trial Motions is cited as "Gov't Response, at ___."

Winter now claims that he should have received a *Miranda* warning prior to being questioned by the agents on February 11, 2000, and that any statements he made during the interview must be suppressed.

## B. Analysis

The Supreme Court's decision in *Miranda v. Arizona*, 384 U.S. 436 (1966) requires that a suspect must be advised of certain rights before he may be subjected to a custodial interrogation in order to protect his right against self-incrimination. *Id.* at 444. Specifically, a person who has been "taken into custody or otherwise deprived of his freedom of action in any significant way" must be "warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed." *Id.* Statements obtained in violation of this rule may not be admitted for certain purposes in a criminal trial. *Stansbury v. California*, 511 U.S. 318, 322 (1994).

These so-called *Miranda* warnings must be given only if the suspect is "in custody" and subject to "interrogation." *U.S. v. Scheets*, 188 F.3d 829, 840 (7th Cir. 1999). The parties agree that Winter was "interrogated" within the meaning of *Miranda* on February 11, 2000. They disagree, however, whether Winter was "in custody" at the time. "In determining whether an individual was in custody, a court must examine all of the circumstances surrounding the interrogation, but the ultimate inquiry is simply whether there [was] a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest." *Scheets*, 188 F.3d at 841 (quoting *Stansbury*, 511 U.S. at 322). This inquiry is based on "how a reasonable man in the suspect's position would have understood his situation." *Berkemer v. McCarty*, 468 U.S. 420, 442 (1984).

Winter argues that the agents "seized the entire staff of Silesia, including Mr. Winter" when they gathered the employees in the lobby and led them individually to separate rooms for

4

questioning. (Motion ¶ 7.) He further claims that he was "effectively in custody" during his interrogation because the agents were in full control of the environment. (*Id.* ¶ 9.) In support of this argument, Winter cites *Sprosty v. Buchler*, 79 F.3d 635 (7th Cir. 1996). In *Sprosty*, police officers converged on the defendant's mobile home to execute a search warrant for pornographic materials and stolen items. The officers found Sprosty sitting in a car in the driveway and pulled up beside and behind his car, blocking his path to the street. Sprosty accompanied the officers into the mobile home while they executed the search warrant and he sat guarded by an armed police officer for nearly three hours. *Id.* at 638. Throughout that time, the officers repeatedly asked Sprosty to show them any incriminating evidence. They also read Sprosty his *Miranda* rights but then continued to question him after he allegedly requested an attorney. *Id.* at 639.

Prior to trial, Sprosty moved to suppress statements and information obtained during the search on the grounds that the officers violated his *Miranda* rights. The district court denied the motion, finding insufficient evidence that the officers were aware that Sprosty wanted an attorney. *Id.* at 639. On appeal, the government argued that Sprosty was not "in custody" for purposes of *Miranda* and that it therefore was irrelevant whether he asked for an attorney. *Id.* at 640. The Seventh Circuit disagreed.

The court first outlined several factors to consider in determining whether a suspect is "in custody": (1) "whether and to what extent the person has been made aware that he is free to refrain from answering questions"; (2) "whether there has been prolonged, coercive, and accusatory questioning, or whether police have employed subterfuge in order to induce self-incrimination"; (3) "the degree of police control over the environment in which the interrogation takes place, and in particular whether the suspect's freedom of movement is physically restrained or otherwise significantly curtailed"; and (4) "whether the suspect could reasonably believe that he has the right to interrupt prolonged questioning by leaving the scene." 79 F.3d at 641 (internal citations omitted). The court noted that while Sprosty was in familiar surroundings and was not handcuffed or

physically restrained to his chair, he could not get his car out of the driveway, he was guarded by an armed and uniformed police officer throughout the nearly three-hour search, and he was subjected to persistent questioning as to the location of any incriminating evidence. *Id.* at 641-42. Thus, Sprosty was "in custody" for purposes of *Miranda* and the police officers were required to cease interrogating him once he asked for an attorney. *Id.* at 643.

Winter claims that some 20 federal agents raided Silesia with a "huge show of force" and that he and his employees reasonably believed that they were not free to leave. He notes that the agents did not inform the employees that they could leave until the afternoon when someone who had already been interviewed asked if he could go. (Motion ¶ 11.) He also questions why the employees would stay for interviews if they did not reasonably believe they were under arrest. (Winter Reply, at 1-2.)[2] In Winter's view, "the whole point was to make [him] believe that he was not free to leave and that he had to submit to questioning." (*Id.* at 4.) This argument misses the mark because Winter does not dispute that he himself was told that the employees were free to leave after they had been identified, as stated in Special Agent Murray's report. (Gov't Response, Ex. B.) A reasonable person in Winter's position would not believe the employees were under arrest, which undermines Winter's claim that the police were attempting to create an atmosphere of intimidation to make him think he could not leave. Winter finds it significant that shortly after the agents secured the premises, an individual entered the building and then immediately exited while making a cellular telephone call, and the agents requested that the individual return to the building. (Motion ¶ 12.) It appears, however, that this episode occurred before the identification process was complete and before agents had told Winter that his employees were free to leave.

Winter was questioned for only 45 minutes, not three hours as in *Sprosty.* Nor does Winter assert that he and the other employees were guarded by armed agents, repeatedly questioned

---

[2]    Winter's Reply Memorandum in Support of Motion to Suppress is cited as "Winter Reply, at __."

about the location of incriminating evidence, or blocked from exiting the building in any way. Significantly, the interviews occurred at Winter's place of business, and no one was physically restrained. *See, e.g., U.S. v. Randle*, 966 F.2d 1209, 1212 (7th Cir. 1992) ("noticeably absent from the affidavit are allegations that the agents used intimidation, force or threats of force, that they displayed weapons, or that they physically restrained [the defendant] in any way whatsoever"). In recognition of the fact that Winter is a German citizen, the agents also specifically informed him that one of the agents spoke fluent German and could translate for him if necessary.

Winter claims that Special Agent Wente's report is untrue to the extent it indicates that prior to his interview, the agents told him that he was not under arrest and did not have to answer any of their questions. Winter notes that the report does not state that agents told him he was free to leave; he seeks a suppression hearing on this issue. (*Id.* ¶ 15.) To establish that a hearing is necessary, Winter "must present 'definite, specific, detailed, and nonconjectural' facts that justify relief." *Randle*, 966 F.2d at 1212 (quoting *U.S. v. Hamm*, 786 F.2d 804, 807 (7th Cir. 1986)). If the agents did not advise Winter that he was not under arrest and under no obligation to answer questions, that would tend to support his claim that he was in custody during the interview. Winter failed to submit a sworn affidavit to that effect, however, and merely asserts that the agents "probably did not tell" him of those rights because similar admonitions do not appear in a report relating to the questioning of another Silesia employee. (Def. Reply, at 4.) Winter's conclusory and speculative allegation in this regard is insufficient to justify a hearing. *See U.S. v. Segal*, 207 F. Supp. 2d 835, 838 (N.D. Ill. 2002) ("[a] defendant who seeks to suppress evidence bears the ultimate burden of proof and persuasion of making a prima facie showing of illegality . . . Reliance on vague, conclusory allegations is insufficient").

Significantly, Winter does not deny that the agents never physically restrained him or blocked him from leaving the building, or that the agents told him his employees were free to leave after the morning identification process. Winter also makes no claim that the agents used threats

of force or a display of weapons. *Segal*, 207 F. Supp. 2d at 838 ("the essential element of a custodial interrogation is coercion"). In light of these facts, Winter has failed to meet his burden of demonstrating that he was in custody on February 11, 2000. *Compare U.S. v. Watson*, No. 93 CR 716, 1997 WL 124268, at *3-4 (N.D. Ill. Mar. 14, 1997) (looking at totality of circumstances, suspect was in custody where he was told twice that he was not under arrest but was never told that he was free to leave or to refuse to answer questions; suspect was questioned at the police station, in the officers' car, and at the crime scene for a four-hour period; and officers watched the suspect change from his sleeping garments into his street clothes).

To avoid this result, Winter claims that it is reasonable to infer that "when agents asked [him] to step into another office to answer their questions, they did whatever they could to leave him with the impression that he did have to talk to them." (Motion ¶ 14.) As noted, such vague, conclusory allegations are insufficient for purposes of a motion to suppress. *Randle*, 966 F.2d at 1212. Winter has failed to demonstrate that he was "in custody" on February 11, 2000 and his motion to suppress statements made during his interview on that date is denied.

## 2. Defendants' Motion for a Bill of Particulars

A bill of particulars is designed to "inform the defendant of the charges, enable him to prepare a defense, and to minimize the danger of double jeopardy and unfair surprise at trial." *U.S. v. Caputo*, 288 F. Supp. 2d 923, 935 (N.D. Ill. 2003). A bill of particulars should be granted if the indictment does not set forth the elements of the charged offense or does not sufficiently advise the defendant of the charges against him to enable him to prepare for trial. *Id.* (citing *U.S. v. Kendall*, 665 F.2d 126, 134 (7th Cir. 1981)). *See also U.S. v. Hernandez*, 330 F.3d 964, 975 (7th Cir. 2003). In determining whether an indictment sufficiently advises a defendant of the charges, a court may consider the complexity of the charges, the clarity of the indictment, and the availability of discovery. *Id.* (citing *U.S. v. Swiatek*, 632 F. Supp. 985, 988 (N.D. Ill. 1986)). A defendant has

a constitutional right to know the offenses with which he is charged, but he is not entitled to the details of the government's case. *Id.*; *Kendall*, 665 F.2d at 135.

In their Motion for a Bill of Particulars, Defendants ask that the government be required to identify certain individuals in the Indictment, such as the Silesia employees whom Winter and Rodas-Misa instructed to arrange illegal liquid flavoring extract shipments, and the Chief Executive Officer of Silesia's parent corporation. (Motion ¶¶ 3, 4A-4H.) Defendants argue that these are people "who will necessarily be witnesses at the trial and there is no basis not to identify them." Defendants further assert that they need the individual names to effectively investigate and defend against the charges. (*Id.* ¶ 3.) The government responds that the indictment clearly sets forth the specific charges against Defendants, including the regulations they allegedly violated, the overt acts giving rise to the conspiracy charges, and the specific shipment dates, amounts, and flash points – i.e., "the minimum temperature at which a liquid gives off vapor within a test vessel in sufficient concentration to form an ignitable mixture with air near the surface of the liquid." 49 C.F.R. § 173.120(c)(1); (Gov't Response, at 8.) The government also notes that it has made extensive disclosures regarding the documents and testimony it plans to introduce at trial, including the various shipping documents. (Gov't Response, at 8.)

In *U.S. v. Hernandez*, the defendants sought a bill of particulars for the names of the minors they allegedly used to sell drugs in violation of federal law. 330 F.3d at 974-75. The district court denied the defendants' motion because the names of the minors were available through discovery, and the Seventh Circuit affirmed. "[A] bill of particulars is not required when the information a defendant needs to prepare his defense is available through 'some other satisfactory form,' such as discovery." *Id.* at 975 (quoting *U.S. v. Canino*, 949 F.2d 928, 949 (7th Cir. 1992)). The government had turned over ledgers, transcripts of audiotapes, and testimony summaries that identified the specific minors who were allegedly involved in the illegal drug operation. Based on those discovery materials, the defendants "could reasonably anticipate the evidence the

government would produce at trial and adequately prepare their defense based on this evidence."
*Id.*

In this case, similarly, the government has disclosed documents and testimony it plans to introduce at trial, including reports of witness interviews and the shipping documents relating to the allegedly illegal shipments. Defendants do not dispute that they could determine the identities of any relevant individuals or locate relevant shipping records from these discovery materials. Nor do they argue that the indictment fails to set out the elements of the charged offenses. Defendants' unsupported assertion that "there is no basis not to identify" the unnamed employees and that they "need" those names is not sufficient for a bill of particulars. (Motion ¶ 3.) *See Swiatek*, 632 F. Supp. at 987 ("[a] generalized and conclusory statement of prejudice in support of a motion for a bill of particulars is, in itself, a basis for denying the motion"). Defendants have not demonstrated that they will be unable to prepare for trial based on the indictment and the available discovery and, thus, their motion for a bill of particulars is denied.

### 3. Defendants' Joint Motion for Exculpatory Evidence

Defendants next seek an order requiring the government to immediately produce evidence in its possession that is favorable to Defendants, *Brady v. Maryland*, 373 U.S. 83 (1963), and information that relates to the reliability and credibility of witnesses. *Giglio v. U.S.*, 405 U.S. 150 (1972). (Motion, at 1.) Defendants identify ten categories of information they claim constitutes such *Brady/Giglio* material. (Motion ¶¶ 3A-3J.) According to Defendants, immediate production of the requested information will allow them "a fair opportunity to effectively investigate and prepare for the trial of a case that the Government has had four years to investigate." (Motion ¶ 3.)

The government acknowledges its duties under *Brady* and *Giglio* and affirms that it "has complied and will continue to comply with its duty" under those authorities. (Gov't Response, at 9.) The government notes that it has disclosed reports of all witness interviews, all shipping

documents, and other documents recovered from the search warrant executed at Silesia's offices on February 11, 2000 which, it claims, satisfies any *Brady/Giglio* obligations. (*Id.*) The court agrees. Defendants have failed to explain how any of the requested information falls within *Brady* or *Giglio*. More importantly, they do not challenge the government's assertion that it has fully complied with the requirements of both cases and recognizes its continuing obligation to do so. Thus, Defendants' motion for exculpatory evidence is denied. *See U.S. v. Alex*, 791 F. Supp. 723, 729 (N.D. Ill. 1992) (government's promise to comply with *Brady* rendered motion for exculpatory or impeaching evidence moot); *U.S. v. Dominguez*, 131 F.R.D. 556, 559 (N.D. Ill. 1990) (government's assurances of compliance with *Brady* and *Giglio* in response to discovery motions were sufficient to defeat those motions).

4. **Defendants' Joint Motion to Suppress Documents**

    A. **Background**

    Maureen Sullivan worked as Silesia's office manager and Winter's executive assistant. On January 7, 2000, she called the FAA Great Lakes Regional Operations Center and informed DOT Special Agent Hunt in the Chicago Civil Aviation Security Field Office that Winter and Rodas-Misa planned to ship improperly packaged goods on a Mexicana Airlines flight out of O'Hare International Airport. (Motion, at 4 and Ex. A.) Sullivan advised Special Agent Hunt that she would be willing to provide a sworn statement and documentary evidence of her allegations. On January 11, 2000, Sullivan met with Special Agent Hunt and DOT Special Agent Richard Busser. She provided them with documents she had taken from Silesia and agreed to contact them if she learned that Winter or Rodas-Misa planned to make any additional improper shipments. She also agreed to sign a statement indicating that she was providing the information voluntarily out of concern for the safety of passengers in aircraft on which any improperly labeled products were transported. (*Id.* at 4-5.)

On January 12, 2000, Sullivan faxed additional Silesia documents to Special Agent Hunt. On the fax cover sheet, Sullivan asked, "Is this what you need?" and instructed Special Agent Hunt to leave a message for her at home indicating what other documents he might want. (Motion, at 5.) Sullivan also noted on the fax cover sheet that "Most of our products from Germany DO come in by Lufthansa." (*Id.*) On January 21, 2000, Sullivan contacted Special Agent Hunt to inform him that Winter and Rodas-Misa planned to ship allegedly dangerous goods on a flight the next day. She also faxed to Special Agent Hunt ten more pages of Silesia documents showing additional instances of alleged improper labeling. (*Id.* at 6.)

The following day on January 22, 2000, Special Agents Hunt and Busser detained Rodas-Misa at O'Hare, seized and searched his luggage, and discovered flavor samples that were allegedly labeled improperly. Two days later on January 24, 2000, Sullivan faxed Special Agent Hunt more Silesia documents, including some of Winter's personal travel documents. On or about February 10, 2000, the government obtained a search warrant for the Silesia offices, relying on: interviews with Sullivan, who provided information to agents based on personal knowledge and who inculpated herself in the alleged violations regarding hazardous materials shipments; an interview of a former Silesia employee who provided corroboration for Sullivan's statements; and a consensually-recorded conversation between Sullivan and Winter in which Winter made repeated admissions regarding the illegality of hazardous materials shipments. (Gov't Supp., at 2-3 and Ex. 1.)[3] The government executed the search warrant on February 11, 2000 and seized a significant amount of documents and information.

Defendants now claim that Sullivan was acting as an agent of the government when she provided them with documents and other information. Defendants argue that the government violated the Fourth Amendment by using Sullivan to obtain documents it could not otherwise have

---

[3]     The Government's Supplemental Response to Defendants' Pre-Trial Motions is cited as "Gov't Supp., at __."

acquired, and that an evidentiary hearing is required to determine "the full extent of the government's efforts to direct Sullivan's procurement of documents from Silesia, and to determine the extent to which those poisoned fruits have tainted the rest of the government's investigation." (Motion, at 7.)

**B.    Analysis**

The Fourth Amendment guarantees citizens the right to be free from unreasonable searches and seizures by the government. *See Lee v. City of Chicago*, 330 F.3d 456, 460 (7th Cir. 2003). Though a search and seizure by a private party does not implicate the Fourth Amendment, the amendment does apply to a search or seizure by a person acting as "an instrument or agent" of the government. *U.S. v. Shahid*, 117 F.3d 322, 325 (7th Cir. 1997). In determining whether an individual acted as an "instrument or agent" of the government, the court considers two "critical" factors: (1) "whether the government knew of and acquiesced in the intrusive conduct"; and (2) "whether the private party's purpose in conducting the search was to assist law enforcement agents or to further [its] own ends." *Id.* (quoting *U.S. v. Koenig*, 856 F.2d 843, 847 (7th Cir. 1988)). Other useful factors include whether the individual acted at the request of the government, and whether the government offered the individual a reward. *Id. See also U.S. v. Segal*, 276 F. Supp. 2d 896, 901 (N.D. Ill. 2003).

Defendants point to several factors that they claim demonstrate Sullivan was acting as an agent of the government. First, on January 12, 2000, she sent Special Agent Hunt documents with a fax cover sheet asking, "Is this what you need?" and instructing him to leave her a message at home regarding other documents he might require. In Defendants' view, this suggests that "there may well have been additional materials provided to the government by Sullivan that are not provided for in the record." (Def. Reply, at 2.)[4] On that same fax cover sheet, Sullivan also

---

[4]     Defendants' Response to Government's Supplemental Response to Defendants'
(continued...)

appeared to respond to a question Special Agent Hunt had posed regarding the shipping method of Silesia's German products: "Most of our products from Germany DO come in by Lufthansa." Defendants argue that the fax indicates that the government was directing Sullivan's actions and telling her to find specific information. (Motion, at 5.) They also claim that "[t]he distinct possibility that additional material was provided to the government without a search warrant by Sullivan while acting as a government agent, should at least require an evidentiary hearing." (Def. Reply, at 2.)

The government first responds that Defendants' motion is moot because the government does not intend to offer any of the documents obtained from Sullivan at trial or sentencing. (Gov't Supp., at 3.) The government does, however, intend to use the originals of those same documents, which it obtained during the search of Silesia's offices on February 11, 2000. (Id.) To the extent that Sullivan's documents may have factored into the scope and direction of the government's investigation and its decision to obtain the search warrant, the court cannot say that the issue is simply moot.

The government argues that Sullivan's documents did not factor into its investigation at all, but that it obtained the search warrant for the original documents it intends to use at trial without any reference to records provided by Sullivan. (Gov't Supp., at 9.) "The independent source doctrine allows admission of evidence that has been discovered by means wholly independent of any constitutional violation." *U.S. v. Hall*, 142 F.3d 988, 993-94 (7th Cir. 1998) (quoting *Nix v. Williams*, 467 U.S. 431, 443 (1984)). The government claims that it had independent probable cause to support the search warrant based on its interviews with Sullivan during which she provided information based on her personal knowledge, including facts that incriminated herself; an interview of a former Silesia employee who provided corroboration for Sullivan's statements; and a

_____

[4](...continued)
Joint Motion to Suppress Documents Obtained in Violation of the Fourth Amendment and for an Evidentiary Hearing is cited as "Def. Reply, at __."

consensually-recorded conversation between Sullivan and Winter in which Winter repeatedly made damaging admissions about Silesia's shipments of hazardous materials. (Gov't Supp., at 9-10.)

Before assessing the government's independence argument, the court must determine whether there has been a constitutional violation in the first place. If not, the government does not need an independent basis for the search warrant. On this issue, the government argues that there was no Fourth Amendment violation because Sullivan had legitimate access to the records she copied and provided to the government. (Gov't Supp., at 5.) The government relies on *U.S. v. Ziperstein*, 601 F.2d 281 (7th Cir. 1979), in which a pharmacist employed at one of the defendant's medical clinics contacted the Federal Bureau of Investigation ("FBI") and reported that he had evidence that the defendant was, among other things, issuing prescriptions that misrepresented the quantity and quality of drugs dispensed. *Id.* at 284, 288-89. The FBI agent "expressed an interest in" the documents and two days later, the pharmacist brought the documents to the FBI "on his own volition without any inducement from the FBI." *Id.* at 289. The FBI reviewed the records, directed the pharmacist to return some that were not relevant, and offered the remainder as exhibits at trial. *Id.*

On appeal, the Seventh Circuit agreed that the documents were admissible at trial because the defendant "did not have a legitimate expectation of privacy in the documents and . . . no government participation in the removal of the documents was established." *Id.* The court stated that an employer does not have a reasonable expectation of privacy in what employees observe in their daily functions, and found that "[c]ertainly pharmaceutical prescriptions come within the daily observation of a pharmacist and were beyond any reasonable expectation of privacy which Ziperstein had." *Id.* The court also noted that there was no evidence of any impropriety in the manner in which the pharmacist obtained the documents. *Id.* at 289-90. Even if the pharmacist did not have authority to obtain the records and the defendant did have a reasonable expectation of privacy, moreover, the pharmacist obtained the documents before he contacted the FBI and

turned them over without government inducement. *Id.* at 290. Thus, there was no basis to suppress the records. *See also U.S. v. Billingsley*, 440 F.2d 823, 826 (7th Cir. 1971) (corporate officer properly and independently took possession of company records where he retrieved most of them before he ever contacted the FBI and there was no evidence that he acted at the government's direction or for the purposes of assisting its investigation).

The government claims that like the pharmacist in *Ziperstein*, Sullivan had legitimate access to the produced documents as Winter's executive assistant and Silesia's office manager. Defendants do not seriously challenge this assertion, arguing instead that at the time Sullivan provided documents to the government, she was already acting as the DOT's agent. (Def. Reply, at 4-5.) The government concedes that Special Agent Hunt asked Sullivan to provide copies of documents supporting her allegations (Gov't Supp., at 5), and Sullivan did comply with that request. There is also evidence that Sullivan produced additional documents in response to a specific government request, asking "Is this what you need?" and confirming that "Most of our products from Germany DO come in by Lufthansa." These facts are distinguishable from *Ziperstein*, where the pharmacist gained possession of the documents before he even contacted the government and turned them over without any government inducement. 601 F.2d at 290. *Cf. U.S. v. Segal*, __ F. Supp. 2d __, 2004 WL 102513 (N.D. Ill. Jan. 20, 2004) (employee was not acting as government agent where, among other things, there was no evidence that the government requested that he obtain the relevant information). The court agrees that, at a minimum, an evidentiary hearing is necessary to determine the extent of the government's involvement in Sullivan's acquisition of Silesia's records.

The government argues that as Silesia's office manager, Sullivan had the authority to consent to a government search for the documents she produced, so the government's use of those records does not violate the Fourth Amendment in any event. (Gov't Supp., at 8) (citing *Ziperstein*, 601 F.2d at 290 n.3) ("one having joint access or control for most purposes could

consent to a search of the jointly controlled goods or premises") (internal quotations omitted). Again, however, the pharmacist in *Ziperstein* was clearly not acting as a government agent. The government has not cited any cases where an employee such as Sullivan, who may have been acting as a government agent, nonetheless had authority to consent to a search.

Having determined that there may have been a Fourth Amendment violation in this case, the court turns to the government's argument that it had an independent basis for the February 10, 2000 search warrant. As noted, the government stresses that it had probable cause for the warrant without reference to any of the documentary evidence supplied by Sullivan. (Gov't Supp., at 9-10.) Defendants respond that an evidentiary hearing is nonetheless necessary to determine the extent to which Sullivan's documents "drove the investigation and whether the procurement of the search warrant was actually 'wholly independent' of Sullivan's conduct." (Def. Reply, at 3) (citing *U.S. v. Grosenheider*, 200 F.3d 321, 328 (5th Cir. 2000) ("what counts is whether the actual illegal search had any effect in producing the warrant")). The court agrees.

Sullivan met with Special Agents Hunt and Busser on January 11, 2000 and provided them with various Silesia documents. The next day, she faxed more documents to Special Agent Hunt along with a note inquiring whether they were the records he needed, and asking him to contact her if he needed anything further. She also appeared to answer a question posed by the agents regarding Silesia's German products. This suggests that the documents Sullivan provided on January 12 were in response to specific requests from the agents. Indeed, Special Agent Hunt concedes that he requested documentation to support Sullivan's allegations. (Gov't Supp., at 5.) It is true that the government did not specifically refer to any of Sullivan's documents in requesting the search warrant on February 10, 2000, but Defendants have raised a question as to whether those documents played a role in the government's decision to seek the warrant in the first place. Under such circumstances, an evidentiary hearing is required to resolve the issue.

In its final challenge to Defendants' motion, the government argues that Winter does not have standing to assert Silesia's Fourth Amendment rights. Defendants correctly note that an individual may not generally assert another's Fourth Amendment rights but must have a personal expectation of privacy that was violated. (Gov't Supp., at 4) (citing *U.S. v. Jackson*, 189 F.3d 502, 507-08 (7th Cir. 1999) ("Fourth Amendment rights are personal rights which . . . may not be vicariously asserted"); *U.S. v. Barrera-Martinez*, 274 F. Supp. 2d 950, 955 (N.D. Ill. 2003) ("[t]o establish an illegal search the defendant must demonstrate a personal expectation of privacy in the place that was searched"). The government claims that Winter had no personal expectation of privacy in the documents Sullivan seized from Silesia and, thus, cannot assert a Fourth Amendment violation.

In support of this argument, the government cites *Williams v. Kunze*, 806 F.2d 594 (5th Cir. 1986), in which law enforcement agents searched the business office of a tax planning company and seized 50,000 to 60,000 documents. *Id.* at 596-97. The company's president and vice-president moved to suppress the documents under the Fourth Amendment but the district court held that as independent contractors, they did not have an expectation of privacy in the company offices and had no standing to challenge the search and seizure. *Id.* at 597. The Fifth Circuit affirmed, finding that the two corporate officers "had no reasonable expectation of privacy in corporate records maintained in a common file room," and that they therefore had "no standing to challenge the search of the corporate premises or the seizure of the documents." *Id.* at 599-600.

The government argues that Winter similarly had no expectation of privacy in the documents located at Silesia's offices. (Gov't Supp., at 5.) Defendants respond that at least some of the documents Sullivan produced were of a private nature, such as Winter's income information, and driver's license. (Motion, Ex. G.) More importantly, there is no evidence regarding where Defendants kept the documents obtained by Sullivan. It may be that most of the documents were kept in commonly accessible files, but it is also possible that some or all of the records were

maintained in Winter's office or in his personal files. The parties may explore these issues at the evidentiary hearing.

In sum, Defendants have raised a question as to whether Sullivan was acting as a government agent when she copied documents from Silesia and their motion for an evidentiary hearing on this issue is granted.

**5.    Defendant's Joint Motion for Early Return of Subpoenas**

Defendants next request an order permitting them to issue subpoenas for the production of documents prior to trial, pursuant to Federal Rules of Criminal Procedure 17(c). (Def. Motion, at 1.) The government does not object to this motion, but asks that it also be allowed to issue trial subpoenas seeking early return dates. (Gov't Supp., at 10.) Both parties may seek the early return of subpoenas and are directed to promptly provide each other with copies of any such subpoenas served on witnesses and any documents received from those witnesses.

**6.    Defendants' Joint Motion for Prior Notice of Rule 404(b) Evidence**

In their final motion, Defendants seek an order requiring the government to provide notice of its intention to offer evidence of "other crimes, wrongs or acts," as contemplated by Federal Rule of Evidence 404(b), at least 30 days prior to trial. (Motion, at 1-3.) The government does not object to this request but reserves its right to provide notice within the 30-day period if new evidence surfaces within that time. (Gov't Supp., at 10-11.) Subject to the government's reservation of right, which Defendants do not contest, Defendants' motion is granted.

**CONCLUSION**

For the reasons stated above, Defendant Ortwin Winter's Motion to Suppress Statements (Docket No. 11-1) is denied. Defendants' Motion for a Bill of Particulars (Docket Nos. 12-1, 17-1) and Joint Motion for Exculpatory Evidence (Docket No. 13-1) are denied. Defendants' Joint Motion to Suppress Documents Obtained in Violation of the Fourth Amendment and for an Evidentiary

Hearing (Docket Nos. 16-1, 16-2) is granted as to the request for an evidentiary hearing and otherwise entered and continued for resolution after the hearing. Defendants' Joint Motions for Early Return of Subpoenas Pursuant to Rule 17(c) (Docket No. 15-1) and for Prior Notice of the Government's Intention to Use Rule 404(b) Evidence at Trial (Docket No. 14-1) are both granted as set forth in this opinion.

ENTER:

Dated:    February 26, 2004

REBECCA R. PALLMEYER
United States District Judge